UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| ROBIN DEE MANDELBAUM, | No. SA CV 16-845-PLA |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| NANCY BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

I.

**PROCEEDINGS**

Plaintiff filed this action on May 5, 2016, seeking review of the Commissioner's[1] denial of her application for Disability Insurance Benefits ("DIB"). The parties filed Consents to proceed before a Magistrate Judge on July 18, 2016, and August 23, 2016.[2] Pursuant to the Court's Order, the parties filed a Joint Stipulation (alternatively "JS") on April 17, 2017, that addresses their

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy Berryhill, the current Acting Commissioner of Social Security, is hereby substituted as the defendant herein.

[2] On June 1, 2017, the case was reassigned to the undersigned Magistrate Judge. [ECF No. 18.]

positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

## II.

## BACKGROUND

Plaintiff was born on March 4, 1959. [Administrative Record ("AR") at 23, 152.]  She has past relevant work experience as a System's Analyst and a Human Resources Business Consultant.  [AR at 23, 34, 51.]

On February 25, 2013, plaintiff filed an application for a period of disability and DIB alleging that she has been unable to work since September 30, 2008. [AR at 152.]  After her application was denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [AR  at 108.]  A hearing was held on August 18, 2014, at which time plaintiff appeared represented by an attorney, and testified on her own behalf.  [AR at 32-59.]  A medical expert ("ME") and a vocational expert ("VE") also testified.  [AR at 38-48, 50-57.]  On November 13, 2014, the ALJ issued a decision concluding that plaintiff was not under a disability from September 30, 2008, the alleged onset date, through December 31, 2011, the date last insured.  [AR at 24.]

Plaintiff requested review of the ALJ's decision by the Appeals Council. [AR at 7-9.]  When the Appeals Council denied plaintiff's request for review on April 12, 2016 [AR at 1-5], the ALJ's decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (citation and internal quotation marks omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (citation and internal quotation marks omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.") (citation omitted).

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

## A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995), as amended April 9, 1996. In the first step, the Commissioner must

determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. Id. The Commissioner then bears the burden of establishing that the claimant is not disabled, because she can perform other substantial gainful work available in the national economy. Id. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since September 30, 2008, the alleged onset date.[3] [AR at 15.] At step two, the ALJ concluded that plaintiff has the severe impairments of obesity, status post gastric bypass surgery[4]; atrial

---

[3]    The ALJ concluded that plaintiff met the insured status requirements of the Social Security Act through December 31, 2011. [AR at 15.]

[4]    Plaintiff had gastric bypass surgery in May 2009, after which she lost 165 pounds, some
(continued...)

4

fibrillation; asthma; sleep apnea; fibromyalgia syndrome; osteoarthritis of the knees bilaterally; and anxiety.  [Id.]  At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listing.  [AR at 16.]  The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[5] to perform  sedentary work as defined in 20 C.F.R. § 404.1567(a),[6] as follows:

> [Can] lift and/or carry 10 pounds frequently, 20 pounds occasionally; stand and/or walk 2 hours ou[t] of an 8-hour day; sit 6 hours out of an 8-hour day; occasionally use foot pedals; occasional stairs; no ladders, ropes, or scaffolds; no balance, stoop, kneel, crouch, or crawl; avoid concentrated exposures to extreme cold, heat, vibration; no work around hazardous machinery or unprotected heights; no concentrated exposure to dust, fumes, and other pulmonary irritants; and limited to moderately complex tasks with an SVP 4 or less.

[AR at 19.]  At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that plaintiff is unable to perform any of her past relevant work as a System's Analyst and a Human Relations Business Consultant.  [AR at 23, 53-54.]  At step five, based on plaintiff's age, education, work experience, and RFC, the ALJ found that there are jobs existing in significant numbers in the national economy that plaintiff can perform, including work as a "Data Entry Clerk" (Dictionary of Occupational Titles ("DOT") No. 203.582-054), and "Clerk Typist" (DOT No. 203.362-010). [AR at 24, 54-55.]  Accordingly, the ALJ determined that plaintiff was not disabled at any time from the alleged onset date of September 30, 2008, through December 31, 2011, the date last insured.  [Id.]

/

---

[4](...continued)
of which she later gained back.  [AR at 20, 236, 1219.]

[5]   RFC is what a claimant can still  do despite existing exertional and nonexertional limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[6]   "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

# V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when she: (1) rejected the opinions of plaintiff's treating pain management physicians, Standiford Helm, M.D., and Hamid Fadavi, M.D.; (2) rejected plaintiff's subjective symptom testimony; and (3) found that plaintiff retained an RFC for sedentary work. [JS at 3.] As set forth below, the Court agrees with plaintiff and remands for further proceedings.

## A. MEDICAL OPINIONS

### 1. Legal Standard

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527. The Ninth Circuit has recently reaffirmed that "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record.'" Trevizo v. Berryhill, 862 F.3d 987, 997 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)). Thus, "[a]s a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester, 81 F.3d at 830; Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing Ryan, 528 F.3d at 1198); Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010). "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830; Ryan, 528 F.3d at 1198.

"[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons." Trevizo, 862 F.3d at 997 (citing Ryan, 528 F.3d at 1198); Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006). "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial

6

evidence in the record." Trevizo, 862 F.3d at 997 (citing Ryan, 528 F.3d at 1198); Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Ryan, 528 F.3d at 1198; Ghanim v. Colvin, 763 F.3d 1154, 1160-61 (9th Cir. 2014); Garrison, 759 F.3d at 1012. An ALJ should weigh the physician's opinion according to factors such as the nature, extent, and length of the physician-patient working relationship, the frequency of examinations, whether the physician's opinion is supported by and consistent with the record, and the specialization of the physician. Trevizo, 862 F.3d at 997; see 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick, 157 F.3d at 725. The ALJ "must set forth his own interpretations and explain why they, rather than the [treating or examining] doctors', are correct." Id.

Although the opinion of a non-examining physician "cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician," Lester, 81 F.3d at 831, state agency physicians are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); Soc. Sec. Ruling 96-6p; Bray v. Astrue, 554 F.3d 1219, 1221, 1227 (9th Cir. 2009) (the ALJ properly relied "in large part on the DDS physician's assessment" in determining the claimant's RFC and in rejecting the treating doctor's testimony regarding the claimant's functional limitations). Reports of non-examining medical experts "may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

### 2. The ALJ's Consideration of the Medical Opinions

On August 4, 2014, Dr. Helm, plaintiff's treating pain specialist, prepared a narrative report in which he noted he had been treating plaintiff for chronic pain since November 2011. [AR at 1401-06.] In his narrative report, he stated that plaintiff had been seen on a monthly basis "to manage her pain medications and to perform procedures as needed." [AR at 1401.] He further stated the following:

7

> [Plaintiff's] widespread body pain in conjunction with her severe bilateral knee pain renders her unable to sit, stand, or walk for greater than 15 minutes before she needs to rest. This prevents her from any substantial amounts of lifting, sitting, standing or walking; which is required of most jobs. The pain affects her cognitive abilities such as focus, concentration and memory. [Her] prognosis is guarded. Her condition will likely remain the same or worsen over the next 12 months. Given [her] current condition and limitations, she does not have the ability to work at a regular job on a sustained basis.

[Id.] He also noted that she "has not gained substantial pain relief or function to return to work." [Id.]

On August 1, 2014, Dr. Helm also completed a Physical Residual Functional Capacity Questionnaire ("Questionnaire"). In the Questionnaire, he noted plaintiff's diagnoses of fibromyalgia, peripheral neuropathy, osteoarthritis, and lymphedema. [AR at 1402.] He reported that her symptoms include widespread body pain, with intermittent aching pain in her epigastrium, and severe, constant bilateral knee pain, and that the pain is characterized as constant and aching, exacerbated by standing, lifting, and changes in the weather. [Id.] Dr. Helm also reported that the clinical findings and objective signs that support his observations include severe tenderness to the bilateral knees, lower extremity edema and tenderness, and an x-ray of the bilateral knees that showed severe osteoarthritis in the knees bilaterally. [Id.] With regard to plaintiff's functional limitations, Dr. Helm opined that the severity of plaintiff's pain or other symptoms would constantly interfere with her attention and concentration; she is incapable of even "low stress" jobs because her pain symptoms already greatly interfere with her function, and "additional stress would only aggravate [the] symptoms; she can walk one block without rest or severe pain; can sit up to 30 minutes at a time; she can stand up to 5 minutes at a time before needing to sit down or walk around; she can stand/walk less than 2 hours in an 8-hour workday; she can sit about 2 hours in an 8-hour workday; she would need to walk around every 30 minutes for about 5 minutes at a time; she would need to be able to shift positions at will; she would need an unscheduled break every 30 minutes; she would need to have her legs elevated with prolonged sitting; she can never lift and carry even less than 10 pounds; she can rarely twist, stoop/bend, crouch/squat, climb ladders, and climb stairs; she has limitations in reaching, handling or fingering; and she would be absent more than 4 days per month as a result of her impairments or treatment.

[AR at 1402-05.]  He stated that the onset date for the symptoms and limitations he described would be January 2011.  [AR at 1406.]

The ALJ gave Dr. Helm's opinion "little weight," as follows:

> Dr. Helm placed the onset of this work capacity as January 2011.  The problem with this is the lack of specific evidence of lymphedema or peripheral neuropathy in the file as of [the] date last insured in December 2011, let alone January 2011.  The recor[d]s from Dr. Helm in January 2012 show [plaintiff] . . . still has 5/5 motor strength in both the upper and lower extremities, with a normal gait, with only mild edema in the knees and intact sensation and the only diagnoses given being knee osteoarthritis, and fibromyalgia syndrome.  Those physical findings do not support the findings and symptoms noted in the questionnaire.

[AR at 22 (citations omitted).]  The problem with the ALJ's discounting of Dr. Helm's opinion because of a lack of evidence of peripheral neuropathy or lymphedema as of December 2011 -- assuming it is even an accurate statement of the record -- is that Dr. Helm did not base his limitations on plaintiff's lymphedema or her peripheral neuropathy.  He instead refers to her "widespread body *pain*," i.e., her fibromyalgia, "in conjunction with her severe bilateral knee *pain*," i.e., her bilateral knee osteoarthritis, as being the conditions that prevent plaintiff from "any substantial amounts of lifting, sitting, standing or walking," and that also interfere with her attention, concentration, and memory.  [AR at 1401.]  Indeed, other than Dr. Helm's one limitation that plaintiff's legs would need to be elevated with prolonged sitting 50% of the time during an 8-hour workday [AR at 1404], which he *might* have found to be necessary because of her lymphedema,[7] he clearly states in his narrative report that his opinion and limitations regarding plaintiff's lifting, standing, sitting, walking, attention, concentration, and memory, are based on plaintiff's *pain* symptoms.  [AR at 1401.]  Accordingly, this was not a specific and legitimate reason to discount Dr. Helm's opinion.

Similarly, the ALJ discounted Dr. Helm's limitations because Dr. Fadavi's January 2012

---

[7]  Plaintiff reported to Dr. Helm in January 2012 that her *pain* "is made worse by walking, standing and touching and better by keeping [her] legs elevated."  [AR at 607.]  Thus, Dr. Helm's opinion that plaintiff would need to elevate her legs 50% of the workday may be related to alleviating plaintiff's pain symptoms and not to her lymphedema.

examination[8] showed full motor strength in plaintiff's extremities, mild edema, normal gait, intact

sensation, with the "only diagnoses" being knee osteoarthritis and fibromyalgia syndrome. In fact,

at that visit, however, plaintiff reported that the pain in both her knees was worse and 5 on a 10

point scale; both knees were found to be "very tender," with mild edema[9]; the stretching medial

collateral ligaments were "very painful bilaterally"; and the Luchman test caused pain in the medial

aspect of both knees. [AR at 609-10.] As a result of his examination, Dr. Fadavi stated that he

was going to "arrange for a series of ultrasound guided [S]upartz injection[s]" in plaintiff's knees

"to improve her function and reduce her pain," and he ordered bilateral unloading custom knee

braces. [AR at 610.] Moreover, contrary to the ALJ's suggestion, there is no evidence that

plaintiff's diagnoses of fibromyalgia syndrome and knee osteoarthritis would necessarily cause

plaintiff to experience less than full motor strength, abnormal gait,[10] or problems with sensation,

---

[8]    The ALJ refers to this report as the "recor[d]s from Dr. Helm in January 2012." [AR at 22 (citing Ex. 8F/86-91).] However, the pages referred to by the ALJ consist of one of Dr. Fadavi's Pain Management Progress Reports [AR at 606-11] -- the only report of Dr. Fadavi's specifically referenced by the ALJ. It appears that the Pacific Coast Pain Management Center at which Dr. Fadavi was employed may have been renamed later as The Helm Center for Pain Management as both facilities have the same address and telephone number. [Compare AR at 1270 with AR at 1321.] The ALJ did not otherwise mention Dr. Fadavi's other reports (or plaintiff's physical therapy treatment notes from that same pain center).

[9]    The Court notes that although both edema and lymphedema have similar symptoms, including swelling, they have different causes: edema is generally caused by circulatory system problems, such as chronic venous insufficiency [see also AR at 41 (ME testified that plaintiff's symptoms behave the same way as Listing 4.11, chronic venous insufficiency)], and lymphedema is caused by damage to the lymphatic system. See http:www.uwhealth.org/physical-therapy-occupational-therapy-speech-therapy/lymphedema-and-venous-edema/13987.

[10]    The Court notes that the Administration's definition of "inability to ambulate effectively" -- a necessary component of meeting Listing 1.02(A) -- does not mention an uneven gait. Instead, to ambulate effectively, an individual must be able to sustain a "reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." 20 C.F.R. § 404, subpt. P, app. 1, § 1.00.(B)(2)(b) (emphasis added). Examples of ineffective ambulation include the inability to (1) walk without the use of a walker, two crutches, or two canes; (2) walk a block at a reasonable pace on rough or uneven surfaces; (3) use standard public transportation; (4) carry out routine ambulatory activities such as shopping and banking; and (5) climb a few steps at a reasonable pace with the use of a single hand rail. Id. "The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." Id. Again, there is no exclusion from the Administration's definition for an individual -- such as plaintiff
(continued...)

and neither Dr. Fadavi nor Dr. Helm found these examination results inconsistent in any way in light of plaintiff's symptoms.

Additionally, Dr. Fadavi's progress reports and the physical therapy treatment notes are consistent with Dr. Helm's opinion. On October 20, 2011, Dr. Fadavi prepared a report based on plaintiff's Initial Pain Management Consultation. [AR at 1212-18.] He reviewed x-rays of plaintiff's knees taken on August 28, 2006, that showed "[o]steoarthritic changes primarily at the medial aspect of both knees with probable mild varus deformity," and on October 7, 2009, that reflected "[s]table moderately severe osteophytic changes, most notable in the medial compartments bilaterally." [AR at 1213.] Although plaintiff demonstrated full range of motion and strength in her upper and lower extremities, her gait was normal, and there was no cyanosis, clubbing or edema in her extremities, Dr. Fadavi noted plaintiff had 16 positive pressure points for fibromyalgia (with 11 of 18 being positive to qualify for that diagnosis). [AR at 1216-17.] He noted that plaintiff had a history of Synvisc injections in her knees "with good pain relief," and that he was going to arrange for a series of ultrasound guided Supartz injections to her knees "to improve her function and reduce her pain." [AR at 1217.] He also stated that plaintiff may benefit from bilateral uploading knee braces to support her joints and reduce her pain, and that he would send her to physical therapy and "include a trial of bracing as well." [Id.] He ordered a trial of an "escalating dose of Save[]lla," a comprehensive course of physical therapy consisting of evaluation and 12 treatment sessions for her bilateral knees and musculoskeletal improvement, and a "course of ultrasound guided bilateral knee injections with Supartz, every week." [AR at 1217-18.]

Between October 21, 2011, and February 15, 2012, plaintiff attended numerous physical therapy sessions, and received five injections to her knees. [AR at 1221-80.] At the Initial Physical Therapy Evaluation on November 14, 2011, plaintiff's gait was observed to be "asymmetrical and antalgic with flatfoot pattern, decreased step/stride bilaterally, decreased

---

[10](...continued)
-- who is able to walk with a normal *gait* but whose treating physician nevertheless found was unable to walk for more than 15 minutes before needing to rest (possibly meeting the example of the individual unable to carry out routine ambulatory activities such as shopping or banking). [AR at 1401.]

stance most obvious on right, poor knee flexion/extension moments and obvious postural sway."

[AR at 1219.] The physical therapist also reported "significant limitations in ability to perform functional ADLs secondary to [symptoms] consistent with her diagnosis." [AR at 1220.] The later physical therapy treatment notes reflect continued knee pain, exacerbation of pain with prolonged walking, a fibromyalgia flare up on February 2, 2012, an episode where she got down on the floor to put something in a drawer and could not get back up, and a fall. [See generally AR at 1219-81.] By February 15, 2012, plaintiff had "progressed very well overall" with her physical therapy program, and the final physical therapy note on February 15, 2012,[11] stated that plaintiff "continues to exhibit an extension lag bilaterally"; her active range of motion had changed on the right from 0-15-113 degrees to 0-10-118, and on the left from 0-20-108 to 0-14-115, "with some fluctuation depending upon pain level and/or intermittent swelling." [AR at 1219, 1280.] She was reported to be able "to get up and down from floor and ambulate up stairs without difficulty," but reported "intermittent exacerbations and difficulty with descending steps." [AR at 1280.] She was "ambulating at least 20-30 minutes with shopping tasks, and longer with intermittent breaks." [Id.] She also demonstrated good compliance with her home exercise program. [Id.]

Between October 21, 2011, and March 21, 2012, in addition to seeing Dr. Fadavi for the Supartz injections, plaintiff also had regular office visits with Dr. Fadavi. [AR at 1223-28, 1247-52, 1270-75, 1282-86.] Dr. Fadavi's Pain Management Progress Reports during that period reflect the following: (1) walking is very difficult and plaintiff's knee pain ranged from 5/10 to 8/10 [AR at 1223, 1248, 1271]; (2) she exhibited 16 positive sites, indicative of fibromyalgia syndrome [AR at 1226-27]; (3) Dr. Fadavi recommended ultrasound guided Supartz injections to improve plaintiff's function and reduce her pain [AR at 1227]; (4) he recommended bilateral unloading knee braces to support her joints and reduce her pain [AR at 1228]; (5) plaintiff obtained moderate pain relief from the Supartz injections but "still has pain more during ambulation" [AR at 1247]; (6)

---

[11]   The note recommended physical therapy on "an as needed basis only over the next 1-2 months to provide assistance with exacerbations, but more importantly to advance program safely as appropriate so she can continue with progress of functional ADLs." [AR at 1280.] It appears that plaintiff started another course of physical therapy on May 23, 2012. [See AR at 1296-97.]

"functionally [plaintiff] has not been able to ambulate enough to help with her weight loss and to improve her functional activities" [AR at 1251]; (7) both of plaintiff's knees were painful but worse on the left side [AR at 1270]; (8) plaintiff had good relief from the Supartz injections until the prosthetist tried to measure her knee for a brace and her knee pain was exacerbated [id.]; (9) functionally plaintiff is unable to go to the gym anymore [AR at 1271]; and (10) plaintiff needs better knee support and protection and needs custom made bilateral unloading knee braces. [AR at 1274.] Thus, Dr. Fadavi's January 2012 report -- and the numerous other Progress Reports and physical therapy treatment notes from Pacific Coast Pain Management Center -- actually appear to be consistent with, and not contradictory to, Dr. Helm's opinions.

Plaintiff testified that her leg swelling started in 2008, and when she was later diagnosed with lymphedema, she was told that the lymphedema was possibly caused by the gastric bypass surgery she had in 2009, "or the several surgeries" she had after that. [See AR at 39, 49.] Her treating physician, Alan R. Schenk, M.D., noted edema on examination in what appears to be 2005. [AR at 727, 728-29.] Left leg swelling was also noted in a May 1, 2009, treatment note. [AR at 821.]

Even Dr. Wallach, the ME to whom the ALJ gave "significant weight" because he had reviewed all of the medical records, testified that plaintiff's osteoarthritis of the knees was debilitating, "significant and limiting," and -- he initially testified -- met a Listing even *without* the lymphedema. [AR at 40-42.] Dr. Wallach did not express any opinion that plaintiff's full motor strength, normal gait, or intact sensation were in any way inconsistent with Dr. Helm's opinion. In fact, until the ALJ suggested that because plaintiff's date last insured was December 2011 the ALJ had to find plaintiff disabled prior to that date, and that she (the ALJ) believed that plaintiff "seemed to be ambulating okay" prior to that date[12] [AR at 42], Dr. Wallach was of the opinion that

---

[12] The ALJ stated that she has "to find [plaintiff] was disabled prior to 12/2011," and suggested to the ME that "the lymphedema might bring [plaintiff] into a -- equals the 1.02(a) with the inability to ambulate, but that [lymphedema] wasn't in existence then," to which the ME replied "Right." [AR at 43.] The Court notes that plaintiff's lymphedema might not have been *diagnosed* prior to December 2011, but that does not necessarily mean that it was not *in existence* at that time. And, in response to questioning by the ME, plaintiff indicated she had been told the lymphedema "might (continued...)

13

plaintiff was *not* able to ambulate effectively as far back as November 12, *2010*, because of her osteoarthritis.  [AR at 41-42 (confirming in response to the ALJ's questioning that plaintiff met Listing 1.02 because of her inability to ambulate effectively).]  "An ALJ cannot arbitrarily substitute [her] own judgment for competent medical opinion, and [s]he must not succumb to the temptation to play doctor and make [her] own independent medical findings."  See Banks v. Barnhart, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) (internal quotation marks, alterations, and citations omitted).  In reviewing the medical opinions of record, that appears to be what the ALJ has done here.

Additionally, not only was Dr. Wallach's testimony somewhat confusing and ambiguous as to whether and when plaintiff met a Listing  (and, notwithstanding how easily he was "led" by the ALJ to change his opinion), the Court agrees with plaintiff that Dr. Wallach's testimony was "flawed" because he never addressed plaintiff's fibromyalgia, and because there is some evidence in the record that plaintiff's swelling in her lower extremities may have started as early as 2008 or earlier.  [See JS at 10-11.]  Moreover, although the ALJ stated that Dr. Wallach's testimony was "supported by the objective medical evidence of record," she failed to show *how* Dr. Wallach's testimony was consistent with the objective medical evidence of record, which, as discussed above, she did not accurately consider.  Thus, Dr. Wallach's testimony cannot serve as substantial evidence.  Andrews, 53 F.3d at 1041.

Based on the foregoing, substantial evidence does not support the ALJ's reasons for discounting Dr. Helm's opinion and limitations or for giving the non-examining ME's opinions greater weight than the treating physicians' opinions.  Remand is warranted on this issue.

**B.     SUBJECTIVE SYMPTOM TESTIMONY**

**1.     Legal Standard**

To determine the extent to which a claimant's symptom testimony must be credited, the

---

[12](...continued)
have something to do with" her gastric bypass surgery, thus implying the condition was in existence after May 2009.  [AR at 39-40.]

14

Ninth Circuit has "established a two-step analysis."[13] Trevizo, 862 F.3d at 1000 (citing Garrison, 759 F.3d at 1014-15). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Id. (quoting Garrison, 759 F.3d at 1014-15); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting Lingenfelter, 504 F.3d at 1036) (internal quotation marks omitted). If the claimant meets the first test, and the ALJ does not make a "finding of malingering based on affirmative evidence thereof" (Robbins, 466 F.3d at 883), the ALJ must "evaluate the intensity and persistence of [the] individual's symptoms . . . and determine the extent to which [those] symptoms limit his . . . ability to perform work-related activities . . . ." SSR 16-3p, 2016 WL 1119029, at *4. An ALJ must provide specific, clear and convincing reasons for rejecting a claimant's testimony about the severity of his symptoms. Trevizo, 862 F.3d at 1000-01 (citing Garrison, 759 F.3d at 1014-15); Treichler, 775 F.3d at 1102. During this inquiry, the ALJ may use "ordinary techniques of credibility evaluation, such as . . . prior inconsistent statements." Ghanim, 763 F.3d at 1163 (quoting Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996)). The ALJ may also consider any inconsistencies in the claimant's conduct and any inadequately explained or unexplained failure

---

[13]    On March 28, 2016, after the ALJ's assessment in this case, SSR 16-3p went into effect. See SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). SSR 16-3p supersedes SSR 96-7p, the previous policy governing the evaluation of subjective symptoms. Id. at *1. SSR 16-3p indicates that "we are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term." Id. Moreover, "[i]n doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character[;] [i]nstead, we will more closely follow our regulatory language regarding symptom evaluation." Id.; Trevizo, 862 F.3d at 1000 n.5. Thus, the adjudicator "will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." 2016 WL 1119029, at *10. The ALJ is instructed to "consider all of the evidence in an individual's record," "to determine how symptoms limit ability to perform work-related activities." Id. at *2. The Ninth Circuit noted that SSR 16-3p "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expect to produce those symptoms,' and 'not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness.'" Trevizo, 862 F.3d at 1000 n.5 (citing SSR 16-3p). SSR 16-3p shall apply on remand.

to pursue or follow treatment.  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).

## 2.    Analysis

The ALJ first found plaintiff "not entirely credible" as follows:

> [Plaintiff] has access to various treatment modalities, including pain injections for her knees and physical therapy.  This shows [she] has the capacity for various treatment options and that she is attempting to find what works best for symptom control. . . . The treatment history also shows a normal gai[t] and intact sensation throughout her treatment with Dr. Helm, the pain management specialist, in spite of her complaints of a complete loss of most activities.  Therefore, . . . [plaintiff's] treatment history affects her credibility because the treatment notes show her impairments are not as significant as she alleges.

[AR at 22.]

The ALJ's opinion regarding the impact of progress notes reflecting plaintiff's "normal gait and intact sensation" has been discussed -- and rejected -- in the Court's discussion regarding the medical opinion evidence.[14]  For the same reasons previously discussed, it fares no better as a reason to discredit plaintiff's subjective symptom testimony.  Moreover, the ALJ's statement about plaintiff's "capacity for various treatment options," and suggestion that plaintiff is attempting to find what works best for symptom control, to the extent it is even comprehensible, arguably *supports* plaintiff's subjective symptom testimony far more than it detracts from it.

The ALJ also discounted plaintiff's subjective symptom testimony based on her daily activities:

> Most, if not all of [plaintiff's] statements about her daily activities center on her capacity when the statements were made.  All of the statements in the disability reports are made after the date last insured.  As such, the significance of her symptoms as of that date are not relevant.  Even when asked at the hearing, [her] statements about her daily activities centered on her current capacity, not her capacity before December 2011.  [Plaintiff's] impairments did increase in severity after December 2011, and as such, her capacity would diminish.  However, her capacity prior to that would be greater than she currently alleges because the physical signs show her impairments are not as significant as alleged.

---

[14]    As previously noted, the initial physical therapy evaluation on November 14, 2011 -- prior to plaintiff's date last insured -- actually reflected a "significant asymmetrical and antalgic [gait] with flatfoot pattern, decreased step/stride bilaterally, decreased stance most obvious on right, poor knee flexion/extension moments and obvious postural sway."  [AR at 1219.]

[AR at 23.]  A review of the hearing transcript, however, reflects that prior to her examination of

plaintiff, the ALJ told plaintiff to "concentrate on . . . prior to 12/2011."  [AR at 48.]  Plaintiff agreed

to do so and the ALJ then asked what plaintiff could and could not do prior to that date.  [Id.]

Plaintiff responded:

> I've been kind of like this since I stopped working in 2008 from Resources Global.
> I just kept on thinking I was going to get better so I didn't seek . . . a lot of treatment.
> I'd kind of think, "Oh, this will go away," or, "that will go away."  So it really hasn't
> changed that much.  The only thing that has changed is I finally got it through my
> thick skull this isn't going away.  And I need medical treatment."

[Id.]  The ALJ then suggested to plaintiff that she did not have lymphedema prior to December

2011, and plaintiff responded that her leg started swelling "back then," i.e., in 2008.  [AR at 48-49.]

The only other testimony offered by plaintiff at the hearing referred to needing to use a wheelchair

beginning in the past year, in response to the ALJ's question as to how long she had been using

a wheelchair, and a statement that she has problems with her hands approximately two to three

times a week when her fibromyalgia flares, in response to the ALJ's question "So how are your

upper extremities?"  [AR at 49.]  Thus, plaintiff's testimony at the hearing with respect to her

overall limitations -- including the swelling in her legs -- was not "centered" on her capacity as of

the date of the hearing -- she specifically referred back to 2008 in answering to that question.

Similarly, a review of the disability reports completed by plaintiff reflects that although the

ALJ is correct that "the statements made in the disability reports" were *made* after the date last

insured by simple virtue of the fact that they were *completed* after the date last insured, the

information in the reports is not limited to the date the reports were completed.  [See AR at 170-

80, 188-93, 196-201.]  For instance, in her first disability report, plaintiff reported that she stopped

working in 2005 due to severe pain and tried to go back to work in 2008, but was unable to

continue.  [AR at 171, 180.]  In her first disability report on appeal, which specifically asked her for

any *changes* since her previous report, plaintiff noted only that her condition had worsened

because her atrial fibrillation incidents had increased.  [AR at 188.]  Finally, in her second disability

report on appeal, in response to the same question regarding any *changes* in her condition,

plaintiff reported that she was experiencing increased pain, needed to use a wheelchair, and had

been diagnosed with lymphedema.  [AR at 196.]

Based on the foregoing, the ALJ did not provide clear and convincing reasons to discount plaintiff's subjective symptom testimony.  Remand is warranted on this issue.

**C.    THE RFC FOR SEDENTARY WORK**

Plaintiff contends that the ALJ's determination that plaintiff was capable of less than a full range of sedentary work was error.  [JS at 17.]  Specifically, she notes that Dr. Helm opined that plaintiff would miss more than four days of work per month.  [JS at 17 (citing AR at 1405).]  At the hearing, plaintiff's counsel, noting that Dr. Helm had indicated that since January 2011 plaintiff was likely to miss three plus days per month due to her pain, asked the ME whether that pain was a condition that the ME believed would cause plaintiff to miss that amount of work.  [AR at 47.]  The ME responded, "Well, yeah, he's the guy who examined her so I have to go with what he said. I haven't examined her."  [Id.]  He confirmed that he believed the attendance limitation suggested by Dr. Helm was "a reasonable limitation."  [Id.]  The VE testified that if plaintiff was absent more than three days per month, she "would not sustain employment."  [AR at 56-57.]

Plaintiff also argues that although the ALJ found that plaintiff's severe impairments of sleep apnea and atrial fibrillation can "result in symptoms of dizziness and fatigue," the ALJ did not consider whether these symptoms "would preclude sustained work activity at any exertional level." [JS at 17.]  She further argues that she does not retain the capacity to perform semi-skilled work because of the effects of her pain medications on her ability to work on a sustained basis and to perform more than simple routine tasks.  [JS at 18.]  She notes that Dr. Helm's opinion that her medications interfere with her ability to concentrate or perform complex tasks is uncontradicted. [Id.]  She also submits that the ALJ's findings that plaintiff was capable of performing semi-skilled work because she was able to go grocery shopping, and that she was capable of more than just simple routine tasks based on her ability to "contribute to the decisions regarding her family's finances," were not supported by substantial evidence.  [JS at 18-19.]  She notes that the ALJ failed to demonstrate how such activities translate into an ability to concentrate on complex tasks on a regular and sustained basis.  [Id. (citations omitted).]

Defendant conclusorily contends that the ALJ properly relied on the ME's testimony

regarding plaintiff's pain, fatigue, and dizziness; that Dr. Helm's checkbox form provided no explanation for his conclusion that plaintiff would miss 4 days of work per month, and the ME "did not oppose this estimate . . . [but] he also did not offer an opinion on the same, let alone any evidence supporting such a view"; and the ME's restrictions from exposure to dust, cold, heat, heights, and machinery more than provided for her alleged effects from her atrial fibrillation and sleep apnea. [JS at 19-20.] Finally, defendant contends that the ALJ "specifically considered the effects of Plaintiff's impairments on her mental state and ability to concentrate sufficiently to perform more than simple tasks," when she determined that plaintiff "could still focus enough to make decisions regarding her family's finances." [JS at 20.]

Defendant's arguments -- some of which were never made by the ALJ -- are not persuasive. Remand is warranted on this issue.

## VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits. McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989). Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. See Lingenfelter v. Astrue, 504 F.3d 1028, 1041 (9th Cir. 2007); Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004). Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. See Benecke, 379 F.3d at 593-96.

In this case, there are outstanding issues that must be resolved before a final determination can be made. In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings. First, because the ALJ failed to provide specific and legitimate reasons for discounting the opinions of Dr. Helm and Dr. Fadavi, the ALJ on remand shall reassess the

opinions of these physicians and other relevant sources.[15]  Second, because the ALJ failed to

provide specific, clear and convincing  reasons, supported by substantial evidence in the case

record, for discounting plaintiff's subjective symptom testimony, the ALJ on remand, in accordance

with SSR 16-3p, shall reassess plaintiff's subjective allegations and either credit her testimony as

true, or provide specific, clear and convincing reasons, supported by substantial evidence in the

case record, for discounting or rejecting any testimony.  See also Trevizo, 862 F.3d at 1000 n.5;

Treichler, 775 F.3d at 1103 (citation omitted) (the "ALJ must identify the testimony that was not

credible, and specify 'what evidence undermines the claimant's complaints.'"); Brown-Hunter v.

Colvin, 806 F.3d 487, 493-94 (9th Cir. 2015) (the ALJ must identify the testimony he found not

credible and "link that testimony to the particular parts of the record" supporting his non-credibility

determination).  Finally, the ALJ shall reassess plaintiff's RFC and determine, at step five, with the

assistance of a VE if necessary, whether there are jobs existing in significant numbers in the

national economy that plaintiff can still perform.[16]  See Shaibi v. Berryhill, __ F.3d __, 2017 WL

3598085, at *6-7 (9th Cir. Aug. 22, 2017).


## VII.

### CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the

decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further

---

[15]  The Court notes that for all claims filed on or after March 27, 2017, the Rules in 20 C.F.R. § 404.1520c (not § 404.1527) shall apply.  The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c.  Thus, the new regulations eliminate the term "treating source," as well as what is customarily known as the treating source or treating physician rule.  See 20 C.F.R. § 404.1520c; see also 81 Fed. Reg. 62560, at 62573-74 (Sept. 9, 2016).  However, the claim in the present case was filed before March 27, 2017, and the Court therefore analyzed plaintiff's claim pursuant to the treating source rule set out herein.  See also 20 C.F.R. § 404.1527 (the evaluation of opinion evidence for claims filed prior to March 27, 2017).  If appropriate, 20 C.F.R. § 404.1520c shall apply on remand.

[16]  Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to return to her past relevant work.

proceedings consistent with this Memorandum Opinion.

      **IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

      **This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  August 24, 2017

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE